[Cite as *In re E.H.*, 2023-Ohio-4251.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
MONROE COUNTY

IN THE MATTER OF:

E.H., A.H., N.H., L.H.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 23 MO 0013

---

Juvenile Appeal from the
Court of Common Pleas, Juvenile Division, of Monroe County, Ohio
Case No. 2021 DNA 5959

**BEFORE:**
David A. D'Apolito, Carol Ann Robb, Mark A. Hanni, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. James L. Peters*, Monroe County Prosecutor, and *Atty. Jamie A. Riley Pointer*, Assistant Prosecuting Attorney, for Appellee and

*Atty. Mary Adeline R. Lewis,* for Appellants.

Dated: November 21, 2023

**D'APOLITO, P.J.**

{¶1} Appellants, H.H. ("Mother") and N.H. ("Father") (collectively "Parents"), appeal the June 20, 2023 Opinion and Decision of the Monroe County Court of Common Pleas, Juvenile Division, granting the Motion for Permanent Custody filed by Appellee, Monroe County Department of Job and Family Services ("Agency"), which terminated Parents' custodial right to their four minor children, E.H. (d.o.b. 01/26/10), A.H. (d.o.b. 12/15/11), N.H. (d.o.b. 12/24/14), and L.H. (d.o.b. 02/01/16) (collectively "Minor Children"). Parents advance two assignments of error.

{¶2} First, Parents argue the Agency has not demonstrated by clear and convincing evidence it is in the best interest of Minor Children to be placed in the permanent custody of the Agency. Second, Parents argue they have substantially complied with the Agency's case plan. For the following reasons, the opinion and decision of the juvenile court granting permanent custody of Minor Children to the Agency is affirmed.

## FACTS AND PROCEDURAL HISTORY

{¶3} According to a statement attached to the complaint filed on August 13, 2021, the Agency attempted to conduct a home visit to Parents' Stafford residence on July 28, 2021 after receiving a telephone call from a concerned citizen. The caller reported a cockroach infestation in the home, as well as several dogs in cages and two litters of puppies. The caller further reported Minor Children's hair was washed in a horse trough outside the home as there was no running water in the only bathroom. The caller alleged Minor Children were significantly behind scholastically due to "home schooling" and had not seen a doctor in roughly four years.

{¶4} Parents opened the door of the Stafford residence to Agency supervisor Lisa Swisher and caseworker Rachel Yoho, but Parents refused Swisher and Yoho both entry to the home and access to Minor Children. Parents conceded there was a cockroach infestation, but declined the services of an exterminator offered by Swisher and Yoho without charge.

{¶5} In response to inquiries about Minor Children, Father reported they were not permitted to socialize with other children because Parents "[did not] want anyone on

[their] backs." Parents' hands and clothing were filthy and Mother's shirt was covered in mildew.

{¶6} The Stafford residence was the subject of several previous reports from concerned callers in previous years. As a consequence, Yoho and Swisher could not ascertain whether the caller in 2021 had previously reported concerns. At an initial appearance on August 20, 2021, Minor Children were adjudged dependent.

{¶7} On August 24, 2021, Sergeant Brandon Peska of the Monroe County Sheriff's Department accompanied Yoho and caseworker Jess Murphy to conduct a home visit at the Stafford residence pursuant to an order of the juvenile court. Sergeant Peska's body camera captured the state of the home and was admitted into evidence at the hearing on the motion for permanent custody.

{¶8} According to his testimony, Sergeant Peska noticed the pungent odor of ammonia as he entered the residence, which was in complete disarray. The floors and walls were covered in dirt, and the kitchen countertops and sink were overflowing with dirty dishes containing moldy food covered in bugs. The floor in the only bathroom had collapsed and there was no running water in the bathroom. The bathtub and walls were covered in mold and the walls next to the toilet were covered with feces. One room had clothes piled from the floor to the ceiling.

{¶9} Sergeant Peska testified Minor Children were filthy. One boy had a bruise that could not be explained. Yoho testified that the girls' hair was matted and the boys' speech was unintelligible.

{¶10} Swisher testified Minor Children were permitted to stay one night with their grandmother, however, the condition of her home was unacceptable as well. Grandmother was provided three weeks to prepare the home for the children. During the final Agency visit, Grandmother reported Minor Children would sleep in the attic, which was littered with boxes and dog feces. Grandmother conceded that the home was infested with bed bugs.

{¶11} Yoho offered Parents the opportunity to seek protective supervision of Minor Children, as opposed to the Agency assuming temporary custody. However, Parents refused to grant permission for Minor Children to be interviewed as part of the protective supervision process. As a consequence, Minor Children were placed in the temporary

Case No. 23 MO 0013

custody of the Agency on August 25, 2021, where they remained throughout the proceedings before the lower court.

{¶12} Yoho's initial case plan was filed in November of 2021, and required Parents to undergo psychological evaluations and attend parenting classes. Various structural defects in the residence had to be repaired, then inspected by a contractor who would warrant the residence was safe for Minor Children's return. The residence was also required to be cleared of vermin infestation and clutter. The Agency contracted with Orkin to treat the residence without charge to Parents for one year.

{¶13} Yoho visited the home monthly or bi-monthly after Minor Children were placed in the temporary custody of the Agency. She was denied entrance on four occasions, she could not recall each occasion, but did recall that she was sent away on one occasion because Father was sleeping. Neither parent is employed.

{¶14} Mother insisted Yoho telephone Parents two hours in advance before a home visit. Yoho perceived this request to be a sort of quid pro quo for the Agency requirement that Parents notify the Agency two hours in advance before cancelling a visit with Minor Children. The Agency instituted the rule to benefit the foster parents, who travelled roughly two hours to the Agency. Yoho wanted to save them and Minor Children the long trip should Parents cancel a visit.

{¶15} Yoho testified Parents installed new flooring on the front porch and straightened some of the clutter in the months following Minor Children's removal, but the majority of the structural repairs were not undertaken until shortly before the hearing on the motion for permanent custody held on May 26, 2023. Yoho testified that cleanliness issues would be resolved in part in one visit, then reappear at the following visit.

{¶16} Yoho learned from Chelsea Bone, the Guardian Ad Litem ("GAL"), that the 800 square foot home was heated in winter with a wood-burning stove, which was kept in the crawl space under the home, made accessible by a trap door in what could be described as the living room. Yoho testified the stove was a fire hazard.

{¶17} Parents refused to attend parenting classes due to transportation issues. Yoho offered assistance with transportation but Parents declined. Parents likewise refused to undergo psychological evaluation. The Agency filed a contempt motion to

compel Parents to schedule their evaluations. The evaluations were rescheduled three times.

**{¶18}** Mother, who was 35 years old with a borderline I.Q. when her evaluation was conducted, was diagnosed with mild depression and anxiety. Father, who was 59 years old when his evaluation was conducted, was diagnosed with personality disorder unspecified. Father receives Social Security Disability for seizures.

**{¶19}** The psychologist recommended Parents undergo weekly or bi-weekly individual psychotherapy as well as cognitive behavior therapy, for Father to address his personality disorder and for Mother to address her borderline intellectual functioning. The psychologist further recommended Mother attend parenting classes and take psychotropic medication to control her depression and anxiety.

**{¶20}** As a result of the evaluations, Yoho amended the case plan to include counseling services with a referral to Allwell, a behavior health facility in Caldwell and Cambridge. Katie Weingardner, a therapy group leader at Allwell, testified at the hearing.

**{¶21}** Mother's stated goals for counseling were management of anxiety and depression. Although Mother seemed eager to meet her stated goals, according to Weingardner, Mother attended only three sessions of the women's wellness group. Mother reported the therapy was not helping her problems.

**{¶22}** Father's stated goals were "to adjust activities and responsibilities to a level of competent capacity" and "to accept the role of psychological or behavioral factors in the development of the medical conditions and focus on a resolution of these factors." (5/26/23 Hrg. Tr., p. 31.) Father attended one session of the men's emotional management group.

**{¶23}** Yoho testified Parents were offered transportation assistance for their visits to Allwell, but Parents declined. Weingardner testified Parents did not participate in their respective programs for a sufficient period of time to warrant progress reports. Yoho testified she offered Parents other options for therapy after Allwell but they were not interested.

**{¶24}** Yoho described supervised visitation at the Agency as frequently "chaotic in nature" and "not really beneficial to [Minor Children]." (*Id.*, p. 136.) Minor Children

would fight relentlessly. Mother would yell at them but they would ignore her. Father displayed no interest in restoring order.

**{¶25}** When visits were calm and happy, Father would disclose information to Minor Children, which he should have known would upset them, for instance, that a relative had died. On one occasion, Father told Minor Children "all their cats and dogs died." (*Id.*, p. 137.) Minor Children cried throughout the remainder of the visit.

**{¶26}** Parents canceled three visits with Minor Children. At two scheduled visits, Parents arrived at the Agency, but Father refused to attend visitation. On one occasion, visitation was moved outside to accommodate Father. Yoho believed Father refused to enter the building due to his objections to the mask mandate during COVID.

**{¶27}** Yoho testified that E.H. enjoyed dressing well and styling her hair, but was noticeably less attentive to her appearance on scheduled visitation days. Yoho further testified that the boys were more engaged with their foster families than with Parents.

**{¶28}** Richard Newsome is a licensed social worker employed by Quality Moments. He was the counselor assigned to Minor Children roughly seven months prior to the hearing, and one year after Minor Children were removed from Parents' custody.

**{¶29}** When Newsome first met twelve-year-old E.H., she had imaginary friends. Newsome diagnosed E.H. with adjustment disorder with anxiety. He testified that over the course of the past seven months, E.H. was able to abdicate the role as the primary caretaker of the younger children to the foster parents, and become "more of a kid." (*Id.*, p. 43.) Newsome testified that E.H. had begun to successfully address trauma that occurred in her past. He recommended ongoing counseling for E.H.

**{¶30}** A.H. was very quiet when she first met Newsome. She was also diagnosed with adjustment disorder with anxiety. Newsome recommended continued counseling as A.H. had become more able to discuss her feelings and process past trauma. A.H. confessed guilt for things that happened while she was in Parents' custody. A.H. was often Parents' scapegoat, and E.H. continued the pattern of irrationally blaming A.H. for circumstances beyond the eleven-year-old's control.

**{¶31}** N.H. was very active when Newsome first began counseling him. N.H. was diagnosed with Attention Deficit Hyperactivity Disorder. Over the course of seven months of treatment, and with prescribed medication, N.H. was able to sit calmly and participate

in his treatment. Notably, N.H. attributed feelings of anxiousness at several sessions to information provided by Parents about the custody proceedings. Newsome recommended that N.H. participate in sports in order to channel his energy, and at the same time, benefit from socialization with other boys.

{¶32} Like his sisters, L.H. was diagnosed with adjustment disorder with anxiety. L.H.'s treatment plans included improving social skills and reaching age-related emotional and behavioral goals. L.H. had become more trusting of other people and more able to talk about his feelings as a result of counseling.

{¶33} At the hearing, Newsome underscored the importance of Minor Children's attendance in public school. He testified it is essential for Minor Children to socialize with other children. Yoho testified that E.H. was a member of the school band, and E.H. was taking gymnastics classes until gymnastics conflicted with tutoring at the Agency.

{¶34} Jenna Scott, currently a case manager with Journey Home Foster Care, fostered Minor Children beginning August 16, 2021 and ending July of 2022, when Scott accepted the case management position. Minor Children arrived at her home without any clothing, as no clothing could be salvaged from the Stafford residence. The girls' hair was matted, ultimately E.H.'s hair had to be cut because she was pulling it out. Both of the boys had problems with speech, and L.H. required an Individualized Education Program ("IEP"), for occupational and speech therapy.

{¶35} Initially, the boys were physically abusive to one another and the girls were verbally abusive to one another. The girls' bickering would often result in tears and the refusal to speak to each other. When Scott began fostering Minor Children, she had three biological children and two other foster children in her home. Minor Children adjusted well to the other children.

{¶36} For the first two months, L.H. refused to sit in the bathtub and would scream as if he was being hurt during his bath. Scott attempted to bathe L.H. as expeditiously as possible at first, but L.H. slowly adjusted to the process. Scott testified the girls required extra attention regarding their personal hygiene.

{¶37} Minor Children were admitted to public school, however the school had difficulty placing them. The three oldest children were enrolled in a virtual academy while in Parents' custody, but were far behind their required hours.

**{¶38}** E.H. was initially placed in the fourth grade, then moved to the fifth grade in the middle of the school year. Scott immediately noticed that E.H. squinted, and E.H.'s studies were enhanced when she was fitted for eyeglasses. L.H. was also prescribed eyeglasses. N.H. assimilated well and his ability to concentrate in class improved with medication for his ADHD.

**{¶39}** A.H. required extensive dental work for rotting teeth and ultimately required at least four crowns. A.H. was very delayed, but required considerable intervention in the classroom prior to the development of an IEP. A.H. suffered the most from "home schooling," due to her age, as she was denied fundamental knowledge essential for reading. A.H. was outgoing at home but nervous and scared at school. A.H. and L.H. were moved to the next grade at the conclusion of the year, although neither was performing well academically. Scott was encouraged to press for an IEP for A.H. at the beginning of the next school year.

**{¶40}** Minor Children all initially hoarded food, but A.H.'s issue with food hoarding was more pronounced. Minor Children frequently expressed a longing to see their animals, but never expressed similar feelings about Parents.

**{¶41}** Scott facilitated weekly telephone calls between Minor Children and Parents. Parents frequently used foul language and criticized the caseworkers during their weekly telephone calls with Minor Children. Father referred to Minor Children as "brats," which upset N.H. N.H. confronted Father about N.H's feelings, but Father persisted, so N.H. stopped participating in the telephone calls. On occasion, L.H. has also chosen not to speak to Parents.

**{¶42}** The girls, on the other hand, were typically eager to talk to Parents and frequently asked when Minor Children could return to the Stafford home. Parents mislead the girls by warranting that Parents had done everything required of them by the Agency.

**{¶43}** Parents gave Christmas gifts to Minor Children in 2021, which Minor Children in turn brought to Scott's home. However, Scott discovered cockroaches in her home shortly thereafter and asked Yoho to request that Parents reserve any gifts until Minor Children returned to Parents' custody.

**{¶44}** Following Christmas 2022, the girls excitedly informed Parents that they received makeup and fingernail polish as gifts. Father said the girls should be "smacked"

because "whores" like makeup and fingernail polish. Father referred to his daughter with that term several times. (*Id.*, p. 239.)

**{¶45}** Brittaney S. was Minor Children's current foster mother on the date of the hearing. When Minor Children first arrived, the girls' arguments with one another were heated, and frequently involved clashes over Parents and whether Parents wanted custody of Minor Children.

**{¶46}** Although Minor Children enjoyed the trip to the Agency for visitation, they were subdued on the way home. Typically after visitation, the boys became noticeably more aggressive toward each other, and sometimes toward other children at school.

**{¶47}** Yoho left the Agency in October of 2022. Logan Knowlton was the caseworker assigned to Minor Children in her place.

**{¶48}** Knowlton testified she attempted to make six home visits to the Stafford residence but was denied entry on two occasions. She further testified that during her initial visit and a visit in March of 2023, the home was still very cluttered. There were four beds on her last visit a few days before the hearing, however one of them did not have a mattress.

**{¶49}** Although Father repaired several structural issues at the Stafford residence, Parents never provided a list of the improvements or the results of the inspection by a contractor required by the case plan. Knowlton testified that the bulk of the home improvements were undertaken after the Stafford home had been listed for sale.

**{¶50}** Knowlton supervised eight visits with Minor Children at the Agency. She concurred with Yoho that visitation was chaotic. Knowlton attempted to observe visits by way of a closed-circuit television, but was forced to intervene because Parents consistently ignored her directive not to discuss the case with Minor Children. Prior to the previous court hearing, Mother had a discussion with E.H., which E.H. apparently repeated to N.H. as a result, N.H. was in tears at school because he was afraid to talk to the juvenile court judge.

**{¶51}** Knowlton visited Minor Children in the foster home eight times. She sat with them individually to discuss their progress and any concerns, and she performed a walk through to ascertain whether their basic needs were being met. She testified Minor Children were performing well in school and enjoyed socializing with their peers.

According to her testimony, there were occasions during the visits where each child expressed a desire to return home, and other occasions where each child expressed a desire to remain in the custody of the Agency. According to Knowlton, N.H. and L.H. believed E.H. was their mother.

**{¶52}** Knowlton recommended Parents engage in counseling and parenting classes, however Parents refused. Parents told Knowlton that the juvenile court judge told them they were not required to take parenting classes.

**{¶53}** At the hearing, Knowlton explained the Agency was seeking permanent custody of Minor Children due to Parents' failure to comply with the case plan. The Agency postponed the filing of the motion for permanent custody for five months in order to provide additional time for Parents to reengage counseling services and to schedule and complete an inspection of the home improvements. Seeing no progress, the Agency filed the motion for permanent custody on April 3, 2023.

**{¶54}** The GAL had been assigned to Minor Children since they were placed in the temporary custody of the Agency in August of 2021. She visited the Stafford residence on September 21, 2021, November 17, 2021, and March 29, 2023. She observed considerable progress had been made between her second and third visits. On her third visit, she observed the home had been decluttered and cleaned and no longer had an odor. Certain walls and parts of the ceiling had been repaired, or mudded and dry walled, and painted.

**{¶55}** The GAL had attended visitation at the Agency and concurred that the visits were chaotic. Minor Children do not listen to Parents. The GAL observed that Parents appear incapable of "positive communication" and frequently raised emotional topics that upset Minor Children. Caseworkers had to interrupt and redirect the conversation, as the GAL opined "it [does not] seem that [Parents] know what to talk to the kids about, certainly for the entirety of the visit, which is an hour and a half." (*Id.*, p. 260.)

**{¶56}** Yoho instructed Parents to bring lunch to the Agency for Minor Children. Parents typically brought canned food, usually Vienna sausages, and water. Each child would be given one can of food. If one of the children was still hungry, he or she would demand another child's food, and an argument would ensue. Brittaney S. testified Minor Children would ask to stop for food on the trip home after visitation.

**{¶57}** The GAL testified that Minor Children were happy in both foster homes. At first, Minor Children were guarded, but the girls were first to openly discuss their lives with the GAL and the boys followed. L.H. clings to foster mothers and E.H. and A.H. Minor Children enjoy school and have established friendships.

**{¶58}** According to the GAL, Parents have never acknowledged Minor Children were in a situation at the Stafford residence that warranted removal. Parents believe the Agency is "picking on them." (*Id.*, p. 267.) The GAL opined the conditions in which Minor Children were found in August of 2021 would resume if children were returned to Parents' custody. She recommended that the best interest of Minor Children would be served by awarding permanent custody to the Agency.

**{¶59}** If Minor Children were returned to Parents' custody, Mother testified Parents would maintain Minor Children's regular physicians and counseling appointment schedules and continue their participation in extracurricular activities. However, when asked if Parents would continue their public education, Mother responded, "[t]hat depends." (*Id.*, p. 282.) When asked whether Parents would continue Minor Children's public school education "[i]f it was recommended and [that is] what was best for them," Mother responded, '[y]es."

**{¶60}** On cross-examination, Mother was asked why anyone should believe she would attend to Minor Children's basic needs, since she did not do so before they were removed from her custody. Mother responded, "[w]hy [would I not]? If I move and get a house and that kind of stuff, of course, [I am] going to take my kids to the doctors [sic] and that kind of stuff." (*Id.*, p. 298.) Mother attributed her failure to provide the most basic level of care for her children "because [Parents] were in the process of moving." (*Id.*, p. 297.) When asked the length of time Parents had been attempting to relocate, Mother responded, "[s]ince the first time [Minor Children] were taken away in 2016 and '17." (*Id.*, p. 299.) Mother conceded Parents do not own an automobile.

**{¶61}** When Mother was asked her reason for upsetting the children during visitation with information regarding deaths in the family and among the family pets, Mother explained Minor Children "run into people," so she felt compelled to tell them. (*Id.*, p. 292.) Mother further explained Parents "only [have] eleven cats right now", and "only a handful of cats that [were] there when [Minor Children] were [at the Stafford residence]

are still living. The rest of them have passed away, because they got run over [sic] or something happened to them." (*Id.*, p. 293-294.)

{¶62} Finally, Mother attributed Parents' inability to control Minor Children's behavior during visitation to the allegation the foster parents and caseworkers gave candy to the Minor Children. Mother also accused the foster parents of discarding articles of Minor Children's clothing.

{¶63} Father likewise testified Parents would continue Minor Children's medical and counseling appointments. With respect to the house repairs, Father accused the GAL of foiling his ability to employ a contractor to repair the roof and to purchase a new house.

{¶64} Father testified he repaired the residence without the assistance of professional contractors. He explained he did not have a ladder while he was repairing the ceiling, so he used a heater, then fell from the heater and injured his shoulder. He further explained that he fell off of the roof "a couple of times" while undertaking roof repairs.

{¶65} Father repaired the drywall and painted all of the rooms in the house (replacing paneling in Minor Children's room, which was peeling), with the exception of Parents' bedroom, which still needed to be painted. Father replaced faucets in the kitchen and bathroom that were leaking. The water was shut off due to the leaks, but was restored after the leaks were fixed.

{¶66} Father "remodeled" the kitchen cabinets and moved freezers from the kitchen to the garage. (*Id.*, p. 311.) In addition, Father raised the sinking floor in the bathroom with cement block, and "got it leveled up as solid as [he] could." (*Id.*, p. 313.) Father tiled the living room floor and replaced the wood on the front porch.

{¶67} Following the repairs, Father replaced three "newer" heaters – one in the utility room (which was converted into the boys' bedroom), one in the girls' bedroom, and one in the living room. He placed a wood-burning stove in the basement to prevent the pipes from freezing in winter. (*Id.*, p. 311.)

{¶68} Father alleged Minor Children suffered dog bites while in foster care, however he did not report their injuries to the case worker. He testified he told Minor Children to report their injuries. (*Id.*, p. 320.)

**{¶69}** Finally, Father testified he discontinued counseling after one session because "it [was not] doing any good." (*Id.*, p. 325.) When asked why counseling was not helpful, he responded, "[b]ecause too much of a harassment to get a ride there, for one." When asked if he requested assistance from the Agency with transportation, he responded, "[n]o. I doubt if they could have helped me." (*Id.*)

**{¶70}** In a judgment entry filed on June 20, 2023, following a detailed review of the facts adduced at the May 26, 2023 hearing and consideration of in camera interviews conducted by the juvenile court with Minor Children, in which they expressed their desire to return to Parents' home, the juvenile court granted the Agency's motion for permanent custody. The juvenile court opined the Agency used reasonable efforts to avoid continued removal of Minor Children from the Stafford home, but "the record is devoid of any serious efforts [Parents] made during [the pending case] to comply with the case plan or to remedy the issues that caused the removal of [Minor Children.]" (6/20/23 J.E., p. 7.) The juvenile court further opined, "[i]n addition the Court notes that this is the second time [Minor Children] were removed from the home and that after the children were returned after the first removal [Parents] allowed the deplorable conditions [Minor Children] were living in to reoccur."

**{¶71}** This timely appeal followed.

## LAW

**{¶72}** "[T]he right to raise a child is an 'essential' and 'basic' civil right." *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208 [31 L.Ed.2d 551] (1972). A parent's interest in the care, custody, and management of his or her child is "fundamental." *Id.*; *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388 [71 L.Ed.2d 599] (1982). The permanent termination of a parent's rights has been described as "the family law equivalent to the death penalty in a criminal case." *In re Smith*, 77 Ohio App.3d 1, 16, 601 N.E.2d 45 (6th Dist.1991). Therefore, parents "must be afforded every procedural and substantive protection the law allows." *Id.*

**{¶73}** "(A) court exercising Juvenile Court jurisdiction is invested with a very broad discretion, and, unless that power is abused, a reviewing court is not warranted in

disturbing its judgment." *In re Anteau*, 67 Ohio App. 117, 119, 36 N.E.2d 47, 48 (1941). "The term 'abuse of discretion' connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable (* * *)." *In re Jane Doe 1*, 57 Ohio St.3d 135, 137, 566 N.E.2d 1181, 1184 (1990), citing *State v. Adams*, 62 Ohio St.2d 151, 157, 172-173, 404 N.E.2d 144, 148-149 (1980).

{¶74} A juvenile court's decision to terminate parental rights and transfer permanent custody of a minor child must be supported by clear and convincing evidence. *Santosky*, *supra*, paragraph three of the syllabus. "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is [an] intermediate [standard], being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and *unequivocal*." (Emphasis sic). *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954).

{¶75} When reviewing the decision of a juvenile court to determine whether it is supported by clear and convincing evidence, "a reviewing court may not as a matter of law substitute its judgment as to what facts are shown by the evidence for that of the trial court" because the "trial judge, having heard the witnesses testify, was in a far better position to evaluate their testimony than a reviewing court." *Id.* at 478, 120 N.E.2d 118. "Where the evidence is in conflict, the trier of facts may determine what should be accepted as the truth and what should be rejected as false." *Id.* "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus. *In the Matter of K.J. and S.M.J.*, 7th Dist. Jefferson Nos. 21 JE 0022 and 21 JE 0023, 2021-Ohio-4299, ¶ 29, quoting *In re T.N.T.*, 7th Dist. Jefferson No. 12 JE 25, 2013-Ohio-861, ¶ 14-15.

{¶76} When a motion for permanent custody is filed by a children services agency, the juvenile court's decision whether to grant permanent custody to the agency is governed by R.C. 2151.414(B)(1), the first prong of the permanent custody test, which provides:

[T]he court may grant permanent custody of a child to [the agency] if the court determines at the hearing * * * by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

(a) The child * * * cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period and * * * * the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code [to be an abused, neglected, or dependent child] or the date that is sixty days after the removal of the child from home.

R.C. 2151.414(B)(1)(a)-(e). Parents do not contest Minor Children have been in the temporary custody of the Agency for twelve or more months of a consecutive twenty-two-month period.

**{¶77}** In addition to the first prong, "[an] agency [also] bears the burden of proving by clear and convincing evidence that the grant of permanent custody is in the child's best interest." *Matter of J.C.*, 7th Dist. Monroe No. 20 MO 0012, 2021-Ohio-1476, ¶ 6, citing *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 26. "R.C. 2151.414(D)(1) sets out a nonexhaustive list of factors the court must consider, and the court is encouraged but not required to address the factors relevant to the decision." *Matter of J.C.* at ¶ 6.

**{¶78}** R.C. 2151.414(D)(1) provides:

In determining the best interest of a child * * *, the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a)-(e).

Case No. 23 MO 0013

## ASSIGNMENT OF ERROR NO. 1

**THE TRIAL COURT ERRED IN FINDING THAT IT IS IN THE MINOR CHILDREN'S BEST INTEREST THAT THEY BE PLACED IN THE PERMANENT CUSTODY OF THE MONROE COUNTY CHILDREN SERVICES AS THE PROSECUTION FAILED TO MEET ITS BURDEN OF PROOF AND THE TRIAL COURT'S DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

**{¶79}** When removed from Parents' custody in August of 2021, Minor Children had not seen a physician in roughly four years. Two of the children needed eyeglasses. A.H. required substantial treatment for dental problems resulting from Parents' neglect. The boys' speech was unintelligible. N.H. was prescribed medication for his ADHD. Consequently, the record reflects Parents had repeatedly withheld medical treatment from Minor Children. *See* R.C. 2151.414(E)(7).

**{¶80}** The three school-aged children were derelict in their online work. E.H., age eleven, functioned as the de facto parent of her three younger siblings and had an imaginary friend. Minor Children were living in structurally dangerous and filthy conditions. In their first foster home, Minor Children required training in basic hygiene. A two-month adjustment period was required for L.H. to be bathed.

**{¶81}** According to all of the testimony at the hearing, Minor Children were either withdrawn or manic when they were removed from Parents' custody. With proper diagnoses and counseling, Minor Children's ability to process their feelings improved over time. Minor Children flourished socially in public school and each of them began to overcome the intellectual deficits resulting from Parents' neglect, with varying degrees of success.

**{¶82}** The efforts of the Agency and foster parents to cultivate Parents' relationship with Minor Children, although occasionally successful, was typically derailed by Parents' inability to communicate appropriately with Minor Children, compounded by Parents' pronounced mistrust of the parties entrusted with Minor Children's welfare.

**{¶83}** Parents ignored Agency guidelines, which discouraged Parents from discussing custody issues with Minor Children. Father in particular was incapable of

Case No. 23 MO 0013

respecting Minor Children's boundaries, for instance, N.H.'s aversion to being called a "brat." Father was likewise incapable of appreciating Minor Children's emotional maturity, for instance, blurting out that all of their pets were dead or labelling the girls as "whores." Mother's inability and Father's disinterest in instilling discipline in Minor Children are evident. Consequently, the interaction and interrelationship of Minor Children with Parents supports the juvenile court's award of permanent custody to the Agency. *See* R.C. 2151.414(D)(1)(a).

**{¶84}** Although Parents provided empty promises at the hearing regarding continuing Minor Children's medical appointments, public school education, and extracurricular activities, there is nothing in the record to support Parents' pronouncements. Despite countless opportunities to improve their ability to parent their children, through parenting classes, group counseling, and psychotherapy, Parents offered little more than flimsy excuses for their failure to capitalize on the assistance provided without charge by the Agency. At the hearing, Mother inexplicably predicated her ability to provide for Minor Children's basic needs on Parents' ability to move to a new residence.

**{¶85}** Further, the custodial history of Minor Children further supports the juvenile court's decision to award permanent custody to the Agency. Minor Children were previously removed from Parents' custody. Once returned to Parents' custody, Minor Children's physical and mental health, education, and surroundings degenerated to the point that they had to be removed a second time. *See* R.C. 2151.414(D)(1)(c).

**{¶86}** In summary, the record is replete with evidence that Minor Children's need for a legally secure permanent placement cannot be achieved without a grant of permanent custody to the Agency. Accordingly, we find Parents' first assignment of error is meritless.

## ASSIGNMENT OF ERROR NO. 2

**THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY OF THE MINOR CHILDREN TO THE MONROE COUNTY CHILDREN SERVICES AS THE APPELLANT'S [SIC] HAD SUBSTANTIALLY COMPLETED HER [SIC] CASE PLAN AND THE AGENCY HAD FAILED**

**TO ASSIST MOTHER [SIC] IN RESOLVING THE ISSUES KEEPING THE CHILDREN FROM HER [SIC] CUSTODY IN A REASONABLE AMOUNT OF TIME.**

{¶87} R.C. 2151.414(E)(1) reads, in relevant part:

In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

{¶88} Parents argue in their brief that "the objectives of the case plan were for the home to be fixed and brought up to the [the Agency's] standard, the [Parents] to get

Case No. 23 MO 0013

mental health evaluations, and for the [Parents] to follow through with any recommendations." (Appellant's Brf., p. 14.) Parents' argument continues, "[Parents] testified that they did not wish to continue counseling as they did not think it would be helpful for them and they struggled to find rides and make it work. Although they did not follow through with the group counseling sessions as recommended, [Parents] did get assessments and there was no testimony that there was any finding of any remarkable mental health disorders that would keep them from being suitable parents to their children." (Appellant's Brf., p. 14-15.)

{¶89} Contrary to Parents' argument, there is clear and convincing evidence in the record Parents did not substantially comply with the case plan, despite reasonable efforts from the Agency to facilitate their reunification with Minor Children. Parents undertook the initial steps of each case plan goal, then consistently blamed others for their failure to fulfill the specified goal.

{¶90} First, Father testified he made several structural repairs to the Stafford residence, however, the residence was never inspected by a professional contractor nor determined to be safe for occupancy. Father claimed that he contacted several local contractors, but accused the GAL of actively interfering with his ability not only to hire a contractor but to sell the house.

{¶91} Parents initiated then immediately discontinued group therapy claiming it was not helpful – Mother after three sessions, Father after one. Father complained that transportation was an issue, but conceded he did not ask the Agency for assistance because he did not believe caseworkers would oblige him. However, the record reflects the Agency offered assistance with transportation on more than one occasion but Parents declined.

{¶92} Although Parents attempt to minimize their mental health diagnoses, the psychologist considered their diagnoses sufficiently serious to warrant psychotherapy and behavioral counseling. Nonetheless, neither parent underwent any treatment.

{¶93} As the GAL observed at the hearing, Parents have not acknowledged, nor do they appear to appreciate, the damage they have inflicted on Minor Children's physical, emotional, and intellectual development. Further, by eschewing opportunities to improve themselves and their parenting skills through psychotherapy and counseling,

Parents have failed to demonstrate they are any more capable of providing for Minor Children's basic needs than they were before Minor Children were removed from their custody.

{¶94} The record reflects the Agency's efforts at reunification were foiled at every turn by Parents' recalcitrance and their unwillingness to either recognize or concede they were not presently equipped to care for Minor Children. However, Parents were quick to assign blame to caseworkers, the GAL, and the foster parents for Parents' failure to substantially comply with the case plan. Accordingly, we find Parents' second assignment of error is meritless.

## CONCLUSION

{¶95} For the foregoing reasons, the opinion and decision of the juvenile court granting permanent custody of Minor Children to the Agency is affirmed.

Robb, J., concurs.

Hanni, J., concurs.

Case No. 23 MO 0013

————————————————————

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas, Juvenile Division, of Monroe County, Ohio, is affirmed. Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## <u>NOTICE TO COUNSEL</u>

**This document constitutes a final judgment entry.**